UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CINDY F. HIEMER,

    Plaintiff,

v.                                            Case No. C-1-05-124

ANTHEM INSURANCE
COMPANIES, INC.,

    Defendant.

## ORDER

This matter is before the Court upon defendant's motion for summary judgment (doc. 24). Plaintiff Cindy Hiemer opposes the motion (doc. 32). Defendant has filed a reply in support of the motion (doc. 38). Defendant has also filed proposed findings of fact and conclusions of law (doc. 39), which plaintiff has highlighted as true, false, or irrelevant (doc. 45). The Court heard oral arguments on the motion on February 21, 2007.

### I. Introduction

Plaintiff is a resident of the Commonwealth of Kentucky. Defendant Anthem Insurance Companies, Inc. (Anthem) is an Indiana corporation and is a resident of Ohio that does business in Ohio. Plaintiff was employed by Anthem in its Cincinnati office from April 2002 until July 17, 2003. She was most recently employed as a Customer Service Representative.

Plaintiff makes the following allegations in the complaint: She was fully qualified for her

1

position at all relevant times. She suffers from a severe lung condition that is a serious health condition and substantially limits her ability to breathe. At all relevant times, Anthem and plaintiff's immediate supervisor, Customer Service Manager Andrew Graham, were aware of plaintiff's lung condition and were aware that she was under a doctor's care for that condition.

In December 2002, plaintiff left work to go to the emergency room because she was having severe difficulty breathing. She informed Graham that she was leaving, why she was leaving, and where she was going. When she returned to work two days later with a doctor's note, Graham issued plaintiff a written warning for attendance.

When plaintiff became pregnant in May 2003,[1] her pregnancy exacerbated her lung condition and she was required to wear an oxygen tank, which she wore at work. At all relevant times, Anthem and Graham were aware of plaintiff's pregnancy. In May, Anthem approved plaintiff for intermittent FMLA leave related to her lung condition and medical conditions related to her pregnancy.

Plaintiff exercised her FMLA leave on at least six occasions between May 2003 and July 8, 2003. Defendant refused to allow plaintiff's husband to call in her absences.

On or about July 8, 2003, plaintiff discussed with Graham that she did not have a telephone. Graham agreed that if plaintiff was not at work, then he would understand that her absence was to be covered by FMLA leave unless plaintiff informed him otherwise. Graham further agreed that plaintiff did not have to call in each time she took FMLA leave. In the same conversation, plaintiff asked Graham to accommodate her disability by placing her in an open

---

[1] Plaintiff acknowledged at oral argument that the complaint mistakenly lists several of the dates as 2002. The correct dates are set forth in this Order.

position that required significantly fewer telephone responsibilities.

Plaintiff took FMLA leave due to her disability and serious health condition on July 9-10, 2003.  On July 11, 2003, plaintiff e-mailed Graham and Benefits Administrator Brandy Benge and informed them that she had been unable to work since July 9, 2003, that she required surgery, and that she needed to apply for short-term disability.  Plaintiff called Benge on or about July 17, 2003, to inquire about the short-term disability paperwork.  On information and belief, defendant decided to terminate plaintiff's employment on July 17.  On that same date, defendant sent plaintiff a written warning from Graham and a letter from Human Resource Consultant Kim Armstrong informing her that she was terminated for attendance reasons.  The written warning listed seven separate absences as the basis for plaintiff's termination.  Six of the seven absences were time taken off under plaintiff's intermittent FMLA leave, and plaintiff took the remaining absence to care for her son's serious health condition for which he was under a doctor's care.

Defendant's decision to terminate plaintiff was motivated by her exercise of her rights under the FMLA and was in retaliation for her exercising her right to FMLA leave; it was motivated by her gender; it was motivated by her pregnancy and by medical conditions related to her pregnancy; and it was motivated by defendant's desire to avoid providing plaintiff with employment benefits to which she was entitled.  Defendant engages in a pattern and practice of gender discrimination, disability discrimination, and retaliation and interfering with employees' rights to benefits.

Based on these allegations, plaintiff brought claims for disability discrimination under Ohio law and the Americans with Disabilities Act (ADA) (Counts I and III); retaliation for requesting an accommodation for her disability in violation of Ohio law and the ADA (Counts II

and IV); gender discrimination in violation of Ohio law and Title VII of the Civil Rights Act of 1964, as amended (Counts V and VI); violation of her rights under the Family and Medical Leave Act (FMLA) (Count VII); breach of Ohio public policy (Count VIII); and violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140 (Count IX). Counsel stated at oral argument that plaintiff is proceeding only on her FMLA claim and is withdrawing the remainder of her claims.

## II. Findings of Fact

1. Anthem sells health and life insurance and serves approximately 1.2 million people.

2. Plaintiff began working for defendant as a full-time Customer Service Representative in April 2002. She reported to Tammy Walker. She was primarily responsible for answering questions for members and providers about defendant's health insurance.

3. In August 2002, plaintiff transferred to defendant's Cincinnati call center where she reported to Andrew Graham, who managed the day-to-day activities of the call center.

4. Defendant's attendance policy in effect at all relevant time states as follows:

    You are expected to personally contact your manager . . . each day you must miss work (unless previously scheduled) within one (1) hour of your regular starting time. If it is necessary for you to leave work during the regular workday, you must discuss the need with your manager and receive approval prior to leaving. If you fail to call in for three (3) consecutive workdays, you will be considered to have resigned your position. Deft.'s motion, exh. G.

5. Plaintiff received a copy of the attendance policy.

6. Plaintiff had an allotment of Paid Time Off (PTO) days for the year. In 2002, plaintiff had exhausted her PTO for the year by early October and she received a verbal warning for an unauthorized absence in November 2002.

7. On December 30, 2002, plaintiff received a written warning for attendance problems.

        Her 2002 performance evaluation noted her attendance problems.

8. Plaintiff's physician, Dr. Halvonik, completed a form dated April 4, 2003, on which he indicated that he did not consider plaintiff's lung condition, known as Fibrosis Mediastintitis, to be incapacitating. Rather, he indicated only that plaintiff's condition required follow-up office visits for evaluation three to five times a year.

9. At all relevant times, Brandy Benge was the disability case manager in the Leave of Absence (LOA) Department assigned to administer plaintiff's FMLA leave. The LOA Department administers disability benefits and other leaves of absences and makes decisions as to whether employees qualify for the FMLA.

10. In 2003, defendant approved plaintiff's FMLA request for absences due to doctor visits relating to her lung condition. Benge notified Graham and plaintiff that she had been approved for intermittent FMLA leave effective April 4, 2003 through October 4, 2003.

11. Beginning April 2003, plaintiff took medical leave on various dates.

12. Plaintiff knew by at least the spring of 2003 that she needed to inform her supervisor if an absence from work was FMLA-related.

13. In June 2003, plaintiff made a request for FMLA-protected leave for her pregnancy. Plaintiff's obstetrician certified that plaintiff was not incapacitated as a result of her pregnancy. The certification indicated that plaintiff would need six to eight weeks off after her pregnancy and may need time off sooner if problems arose. Defendant approved this second FMLA request for intermittent leave effective June 16, 2003, through delivery of plaintiff's baby.

14. Defendant instructed plaintiff that if she were absent due to a pregnancy-related illness,

5

she must call in and state that she was "using FMLA time."

15. Despite delays in returning her FMLA paperwork, defendant allowed plaintiff to use her pregnancy-related FMLA leave to retroactively cover absences related to prenatal visits and morning sickness.

16. Also in June 2003, plaintiff sent an e-mail to Human Resources official Sean McIntyre entitled "Need Some Help." In the e-mail, plaintiff described her medical issues, noting her need to bring an oxygen tank to work, her desire to keep her job, and her pregnancy-related concerns. McIntyre forwarded the e-mail to Kim Armstrong, Senior Human Resources Consultant.

17. Dr. Halvonick indicated in correspondence that plaintiff had a compromised respiratory system. He recommended that plaintiff be reassessed in pulmonary rehabilitation.

18. On Monday, July 7, 2003, plaintiff did not report to work and did not call in to report her absence.

19. Graham sent an e-mail to Armstrong on July 7. He stated that plaintiff had not called or come in and had removed all personal items from her desk, although plaintiff alleges that she had only removed her family pictures for scanning. He closed the e-mail by stating, "She's not coming back!"

20. Plaintiff reported to work forty minutes late on Tuesday, July 8. Her tardy appearance counted as her third absence in exhaustion of her 2003 PTO allotment and warranted her termination under the policy. No action was taken against plaintiff that day.

21. Upon her arrival at work, plaintiff met with Graham and explained that she no longer owned a telephone and needed to use a pay phone to make calls.

22. According to Graham, plaintiff told him on July 8 that she expected to be terminated, she understood why, and she knew there was nothing Graham could do about it in light of defendant's policies. Plaintiff admits that she may have said this to Graham.

23. According to Graham, he reiterated to plaintiff that she was required to call every day she was not already scheduled to be in the office, and he spoke with her about possible disciplinary action that he and Armstrong were still discussing. Plaintiff testified that in response to the concerns she voiced to Graham, he told her that "there was nothing going on, he had to wait for HR to decide on anything, until then I was on the FMLA. I used it."

24. Plaintiff's conversation with Graham is the last conversation she had with him or anyone at Anthem about her attendance.

25. Plaintiff failed to report to work on July 9, 10 and 11, 2003, and she did not call in to report any of these absences as required by defendant's policy.

26. On the morning of July 11, after plaintiff had failed to report for work or call in sick, Graham discussed plaintiff's absences with his manager and Director of the Cincinnati office, Dan Dundes, and Armstrong. According to these three individuals, the decision to terminate plaintiff's employment was made that morning.

7

27. On July 11, at 1:24 p.m., plaintiff went to the public library and sent an e-mail to Benge in Indianapolis stating that she had been out due to her medical conditions and asking for short-term disability paperwork for her doctors to complete. She sent a second e-mail to Graham at 2:27 p.m. telling him she was applying for short-term disability benefits "as of Wednesday," she could not work with her health the way it was, and she had contacted Benge.

28. Plaintiff and her husband drove to Louisville on Saturday, July 12, where she was examined by Dr. Wiese on Monday, July 14. Her pulmonary function tests were "essentially unremarkable" with normal breath sounds, no shortness of breath, and no signs of respiratory distress.

29. Benge sent an e-mail to Armstrong on July 14 about plaintiff's FMLA status.

30. On July 15, Benge sent correspondence to plaintiff regarding her FMLA eligibility and her request for short-term disability benefits.

31. Plaintiff learned of her termination through correspondence from defendant dated July 17, 2003. Graham mailed plaintiff a written warning also dated July 17 regarding her absences.

### III. Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. **Celotex Corp. v. Catrett**, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest

upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249 (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

### IV. Opinion

Plaintiff claims she had a serious health condition that made her unable to perform the functions of her position; she availed herself of the right to FMLA leave by properly notifying defendant of her need for medical leave and by taking medical leave; and defendant terminated her because she exercised her right to FMLA leave. Defendant argues that it is entitled to summary judgment on plaintiff's FMLA claim because (1) plaintiff's absences were not the result of a serious health condition as defined under the governing regulations, and (2) plaintiff did not provide defendant with adequate notice of her need for leave. The issues presented are whether plaintiff suffered from a serious health condition for which she qualified for FMLA leave and whether she informed defendant of the need for the leave and the qualifying reason for

9

the need within the requisite time frame.

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA defines the term "serious health condition," in part, as "an illness, injury, impairment, or physical or mental condition that involves - - (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Title 29 C.F.R. § 825.114 provides guidance as to what constitutes a "serious health condition" by defining the term as an "illness, injury, impairment, or physical or mental condition that involves:

> (1) Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or
>
> (2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
> (i) A period of incapacity . . . of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.
>
> (ii) Any period of incapacity due to pregnancy, or for prenatal care.
>
> (iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
>
> (A) Requires periodic visits for treatment by a health care provider, or by a nurse

>or physician's assistant under direct supervision of a health care provider;
>
>(B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>
>(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).
>
>* * *
>
>(b) Treatment for purposes of paragraph (a) of this section includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. . . .Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications . . . or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.
>
>* * *
>
>(e) Absences attributable to incapacity under paragraphs (a)(2) (ii) or (iii) qualify for FMLA leave even though the employee or the immediate family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three days. For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack or because the employee's health care provider has advised the employee to stay home when the pollen count exceeds a certain level. An employee who is pregnant may be unable to report to work because of severe morning sickness.

An employer is prohibited from discriminating against an employee who has used FMLA leave, such as by using the taking of FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220.

Nothing in the FMLA imposes a duty on the employer to affirmatively grant leave wihout a request or notice by the employee. ***Brohm v. JH Properties, Inc.,*** 149 F.3d 517, 523 (6th Cir. 1998). Rather, to invoke the protection of the FMLA, an employee must inform her employer of the need for leave and the qualifying reason for the leave. ***Id.*** (citing ***Manuel v. Westlake Polymers Corp.,*** 66 F.3d 758, 762 (5th Cir. 1995)). The eligible employee must also

11

give the employer this substantive notice within the requisite time frame. The time frame depends on the foreseeability of the needed leave. Where the need for FMLA leave is not foreseeable, the employee should give the employer notice of the need for the leave "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). "It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." The regulation specifies the means by which the employee may provide notice:

> (b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means. The employee . . . will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

The Sixth Circuit in *Cavin v. Honda of America Manufacturing Inc.,* 346 F.3d 713, 723-24 (6th Cir. 2003), summarized the notification requirements of the FMLA as follows:

> [T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave. [*Brohm,* 149 F.3d at 523]. However, '[a]n employee does not have to expressly assert his right to take leave as a right under the FMLA.' *Hammon v. DHL Airways, Inc.,* 165 F.3d 441, 450 (6th Cir.1999); *see* 29 C.F.R. §§ 825.302(c), 825.303(b). Because an employee need not expressly invoke the FMLA, '[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.' *Brohm,* 149 F.3d at 523 (quotation omitted). '[A]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA § [2612(a)(1)] has occurred.' *Hammon,* 165

F.3d at 451.

**(1) Serious health condition**

Plaintiff alleges that there is a genuine issue of fact as to whether she took leave on July 9, 10 and 11, 2003, as the result of a serious health condition. Plaintiff points to nausea and light-headedness caused by her pregnancy and lung condition as the reason for her absences on July 9, 10, and 11. In support of her argument that these absences were FMLA-related, plaintiff asserts that she had previously completed FMLA forms requesting intermittent leave for pregnancy, she had been certified for FMLA leave for her pregnancy post-partum, her doctor had indicated that leave would be required if problems arose during the course of the pregnancy, the federal regulations define any period of incapacity due to pregnancy as a serious health condition, and a jury could reasonably conclude that the nausea and lightheadedness she experienced on July 9, 10 and 11 were related to her pregnancy.

The Court finds that plaintiff has come forward with sufficient evidence to raise a genuine issue of material fact as to whether her lung condition exacerbated the symptoms of her pregnancy to such a degree that a reasonable jury could determine that plaintiff was suffering from a serious health condition that made her unable to perform the functions of her position on the days in question. The issue then becomes whether plaintiff gave defendant adequate notice of her need to take leave as a result of a serious health condition so as to entitle her to the protections of the FMLA.

**(2) Sufficiency of notice**

The Court finds for the reasons explained below that there is a genuine issue of material fact as to whether plaintiff complied with the FMLA's notice requirements with regard to her

13

absences on July 9, 10 and 11, so as to entitle her to invoke the protections of the FMLA.

There is no dispute that plaintiff did not call in to report her absences on July 9, 10 or 11, 2003, in violation of defendant's policy, which required an employee to call in to report an absence within one hour of the start of their shift. Plaintiff claims, however, that both Benge and Graham knew that she was absent from work for reasons related to her medical conditions. Plaintiff argues that Armstrong's assertion that defendant had no reason to know why she may have been absent in early July is not credible since Armstrong knew plaintiff was "on oxygen and pregnant." Plaintiff argues that Graham's assertion that she was not claiming FMLA leave for July 9, 10 or 11 is not credible since she sent the e-mail to him on July 11 stating "I cannot work with my health the way it is."

Counsel for plaintiff also stated at oral argument that plaintiff had discussed with Graham on July 8 that she was late because she had to take pregnancy prescription medication and she had been absent the day before due to her pregnancy, she told Graham that she had no telephone, and the two of them made an arrangement that if plaintiff was unable to come to work, her absence would be treated as FMLA leave. Plaintiff testified regarding their conversation at her deposition. In response to the question of whether she had told Graham that she expected to be terminated when she returned to work on July 8, plaintiff responded,

> . . . I told him I had to go to the library or the gas station to use the pay phone. Yeah. He told me there was nothing going on, he had to wait for HR to decide on anything, until then I was on the FMLA. I used it.

Doc. 35, plaintiff's depo., pp. 297-98.

Graham testified as to his version of the conversation. Graham testified that plaintiff understood that because she had not been in the office the day before and was tardy that day, she

14

expected to be terminated; she told Graham she did not have a phone, but she had been using a pay phone to call anyone she may need to call; he reiterated to her that she was required to call every day she was not already scheduled to be in the office; and he spoke with her about possible disciplinary action that he and Armstrong were still discussing.  Graham depo., pp. 67-68.

      The Court must accept as true for summary judgment purposes plaintiff's version of the conversation she had with Graham on July 8.  A reasonable jury could determine that plaintiff was entitled to rely on Graham's statement that she "was on the FMLA" until Human Resources made a decision on her employment situation, which Graham allegedly made during a conversation with plaintiff concerning her difficulty in calling in her absences, as meaning that defendant understood that her absences during the relevant time frame were FMLA-related.  A reasonable jury could therefore find that defendant had sufficient notice that plaintiff was absent from work on the days in question for FMLA-related reasons and that plaintiff was led to believe by Graham's statement that she was not required to provide additional notice by calling in her absences each day.   Accordingly, defendant is not entitled to summary judgment on the ground that plaintiff failed to provide sufficient notice of her need to take FMLA leave on the days in question.

## V. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment (doc. 24) is **DENIED** with respect to plaintiff's FMLA claim. Plaintiff's remaining claims are **DISMISSED** with prejudice. This case will proceed to trial on the FMLA claim in accordance with the schedule established by the Court.

**IT IS SO ORDERED.**

S/ Herman J. Weber  
HERMAN J. WEBER, SENIOR JUDGE  
UNITED STATES DISTRICT COURT